IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 10, 2008

Charles R. Fulbruge III
Clerk

No. 06-30068

JAMES STARNS

Petitioner-Appellant

v.

O KENT ANDREWS

Respondent-Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:05-cv-00239

Before SMITH and PRADO, Circuit Judges, and YEAKEL[*], District Judge.

PRADO, Circuit Judge:

Petitioner-Appellant James Starns ("Starns"), proceeding pro se, challenges the decision of the district court denying his petition for a writ of habeas corpus as not timely filed. For the following reasons, we REVERSE and REMAND.

I. FACTUAL AND PROCEDURAL BACKGROUND

This habeas petition arises from Starns's conviction of manslaughter for the death of Emmilee Feierabend ("Feierabend"). On March 14, 1996, Starns met Feierabend at a bar. The next day, Starns and Feierabend shared several

---

[*] District Judge of the Western District of Texas, sitting by designation.

drinks at the bar. Seeing that Starns was too drunk to drive, Feierabend offered to drive Starns home. Instead, however, she drove them to a secluded area, allegedly to engage in sexual activity. What transpired next is not entirely clear, but in any event Starns shot and killed Feierabend. At his trial, Starns argued that he acted in self-defense, claiming that Feierabend was the initial aggressor.

The district attorney's office brought the case before a grand jury (the "first grand jury"). The first grand jury heard the testimony of Luis Gonzalez ("Gonzalez"), Feierabend's former employer, and then returned a "No True Bill," declining to charge Starns with any crime. Thereafter, the district attorney's office brought the case before a different grand jury (the "second grand jury"), which did not hear any testimony from Gonzalez. The second grand jury returned an indictment against Starns for second degree murder.

In preparing for the trial, Starns's attorney asked the state for any exculpatory evidence that it had in its possession. The state responded, in part, that Feierabend had been receiving psychiatric treatment for manic/depressive disorder and that the state intended to call her psychiatrist at trial. However, the prosecutor downplayed the importance of any mental health evidence at a separate pretrial hearing, stating that "I don't think there is any relevance to her mental condition or mental state. There has been no evidence whatsoever to call that into question." The state also told Starns as part of its response to his request for exculpatory evidence that Gonzalez had had contact with Feierabend two or three days before her death and that he stated she had been "acting strangely." At a pretrial hearing, Starns's counsel asked for more detail regarding Gonzalez's statements. The prosecutor responded that Gonzalez had testified before the grand jury (without stating which one), meaning that the state could not provide more detail regarding his testimony, but that "this is an incident two or three days prior [to Feierabend's death]. It is not on the day of the incident, so I personally think, once again, it is remote in time and distance

from the actual killing." The state also furnished Starns's lawyer with Gonzalez's address and phone number. The state court rejected Starns's request to require the state to speak with Gonzalez further and provide Starns with additional information, ruling that "the obligation is on the defense to go forward with whatever else you want from this particular witness." Apparently, Starns's lawyer chose not to contact Gonzalez. Gonzalez did not testify at the trial.

The jury convicted Starns of the lesser-included offense of manslaughter, and the judge sentenced him to forty years' imprisonment. Starns appealed his conviction to the Louisiana intermediate court, which upheld his conviction, and the Louisiana Supreme Court denied his writ of certiorari.

After Starns's conviction, Feierabend's husband brought a wrongful death suit against Starns. Apparently, Starns's parents' homeowner's insurance would cover the claim, and the insurance company retained Amos Davis ("Davis") for this civil case. As part of discovery in the wrongful death action, Davis deposed Gonzalez on November 19, 2001. Gonzalez testified that Feierabend had contacted him about two days before her death and again on the day that she died. Gonzalez met with Feierabend for about an hour two days before her death, where she acted "very hyper," seemed "very disturbed," and had the "emotional state" of a person who was "not sane." He stated that Feierabend had four to five alcoholic drinks in front of her and that she said she had stopped taking her medications. She also told Gonzalez that she had "very few days left to live." On the day of her death, Feierabend left a message on Gonzalez's answering machine stating that "today would be [her] last day on earth" and that she was "going on a subway or expressway to heaven." Feierabend called Gonzalez a little while after leaving the message, reiterating these statements and also telling Gonzalez that she had made several tapes to various people in her life to let them know about the impact that they had had on her. She played the tapes she had made for Gonzalez and for one other person over the phone for

3

Gonzalez to hear. According to Gonzalez, the tapes sounded similar to a suicide note. Finally, Gonzalez testified that in his previous conversations with Feierabend, she had told him that she had attempted to commit suicide in the past, that those attempts had been physically painful, and that the next time she tried to commit suicide she would find someone to do it for her. Gonzalez stated at the deposition that he relayed these same statements to the first grand jury, but that neither the district attorney nor Starns's lawyer had contacted him thereafter.

On December 18, 2001, Davis sent Starns's parents a letter and attached a transcript of the Gonzalez deposition. The letter stated that Davis had hand delivered the Gonzalez deposition transcript to Rodney Baum ("Baum"), Starns's new criminal defense lawyer, and Michelle Fournet, Starns's prior defense attorney. The letter also stated that Baum had notified Davis that Baum had started the process of reading the deposition.

On September 20, 2002—277 days after Davis notified Starns's parents about the Gonzalez deposition and 306 days after the deposition actually occurred—Starns filed a state post-conviction application for relief. The Louisiana trial and intermediate courts denied his petition. On January 14, 2005, the Louisiana Supreme Court denied Starns's application for a writ of certiorari, thereby exhausting his state court post-conviction remedies.

On March 24, 2005,[1] Starns filed a petition for a writ of habeas corpus in the district court, alleging a violation of Brady v. Maryland, 373 U.S. 83 (1963),

---

[1] The district court adopted the Magistrate Judge's Report in its entirety, which found that Starns had filed his habeas petition on April 1, 2005. This was error. Under the "prison mailbox rule," a pro se prisoner's federal habeas corpus petition is deemed filed when the prisoner delivers it to prison officials according to the proper prison procedures. See Houston v. Lack, 487 U.S. 266, 276 (1988); Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999). Here, the record reveals that Starns delivered his petition to the prison officials on March 24, 2005. April 1, 2005, is merely the date that the district court clerk filed Starns's petition, which is not the "filing date" in the prisoner context. Therefore, on remand, the district court must use the filing date of March 24, 2005, in its calculations.

and ineffective assistance of counsel. The state answered by asserting that the limitations period for Starns to seek habeas relief under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244, had run. Most relevant to Starns's petition, AEDPA requires a habeas applicant to bring an application for a writ of habeas corpus within one year of "the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence." Id. § 2244(d)(1)(D). The time that an application for state post-conviction relief is pending tolls the running of the federal one-year limitation. Id. § 2244(d)(2). Starns asserts that his application for federal habeas relief is timely based on his learning of the factual predicate for his claims on December 18, 2001, when Davis notified Starns's parents of the Gonzalez deposition, and the fact that his state petitions tolled the federal time limit. In particular, assuming Starns did not learn of the factual predicate for his claims until December 18, 2001, 277 days elapsed from this discovery to September 20, 2002, when he filed a state post-conviction application for relief. At that point, the federal time limitation remained tolled under § 2244(d)(2) until January 14, 2005, when the Louisiana Supreme Court denied his petition for review. Starns then filed his federal petition seventy days later, on March 24, 2005, meaning that under this calculation he met the one-year time limit with eighteen days to spare.

The Magistrate Judge's Report and Recommendation, however, concluded that Starns's federal application was late by seventeen days because Starns learned of the factual predicate for his claims on November 19, 2001, the date of the Gonzalez deposition. The Magistrate Judge concluded that Davis was "Starns's counsel" and learned of Gonzalez's testimony when taking the deposition. Based on the date of November 19, 2001, the Magistrate Judge found that Starns had not filed his state post-conviction application for relief until 305 days after he discovered the factual predicate for his claims through

the exercise of due diligence.[2]  This, along with the time from when Starns exhausted his state post-conviction remedies to when he filed his habeas petition, made his federal habeas petition fall outside of the one-year deadline in AEDPA.  The district court adopted all of the Magistrate Judge's recommendations.  The state did not object to the Magistrate Judge's Report and Recommendation, presumably because the Magistrate Judge recommended denying Starns's petition for a writ of habeas corpus.  Starns submitted an objection to the Magistrate Judge's Report and Recommendation, although due to postal issues stemming from Hurricane Rita, it arrived at the district court after the deadline for responses.  Regardless, the district court considered Starns's objections as a motion for a new trial and denied his request.  Thus, while the state never filed any objections, the district court appears to have considered Starns's objections even though they arrived late, as opposed to ruling that Starns did not timely file them.

After the district court rejected Starns's request for a certificate of appealability ("COA"), this court issued a COA on the issue of whether the district court erred in calculating when Starns or his attorney was aware, through the exercise of due diligence, of the factual predicate for his claims.  We have jurisdiction pursuant to 28 U.S.C. § 1291, as the district court issued a final judgment, and 28 U.S.C. § 2253 based upon the issuance of the COA.

## II.  STANDARD OF REVIEW

We review de novo an order dismissing a habeas petition as time-barred under AEDPA.  See Giesberg v. Cockrell, 288 F.3d 268, 270 (5th Cir. 2002). However, if a party did not object to a Magistrate Judge's Report and Recommendation, that party may not attack the proposed factual findings or legal conclusions except upon the grounds of plain error.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).  Thus, we review

---

[2] The number of days between November 19, 2001, and September 20, 2002, is actually 306 days when including September 20, 2002, in the calculation.

6

the Report and Recommendation with respect to Starns's objections de novo because the district court considered Starns's objections even though they arrived at the court late due to Hurricane Rita. We review any attacks from the state regarding that Report and Recommendation only for plain error because the state did not object at all to the Report and Recommendation. See id.

## III. DISCUSSION

On appeal, Starns argues that the Magistrate Judge erred in her calculation because she erroneously concluded that the civil lawyer in the wrongful death action represented Starns for his criminal habeas petition. The state omits any discussion as to whether the date of the Gonzalez deposition or the date Starns's criminal lawyer learned of the deposition began the limitations period, because it argues that Starns could have learned of Gonzalez's testimony at his trial. Therefore, this appeal presents two issues: (1) Could Starns, through the exercise of due diligence, have learned of the factual predicate for his claims at his trial, and (2) if not, did the district court err in accepting the Magistrate Judge's calculation that used the date of Gonzalez's deposition to measure the one-year time limit in AEDPA?

A. Starns did not fail to act with due diligence to learn of the factual predicate for his claims at his trial

The Magistrate Judge found that "the factual predicate underlying Starns' current habeas petition could have been discovered through the exercise of due diligence as early as November 19, 2001," which is the date of the Gonzalez deposition. The state now argues for the first time that Starns could have learned of the content of Gonzalez's testimony through the exercise of due diligence at his trial. The state premises its argument on the fact that the state notified Starns that Gonzalez had had contact with Feierabend prior to her death and that Gonzalez stated that Feierabend had been acting strangely. The

state concludes that Starns's failure to interview Gonzalez based on this evidence constitutes a lack of due diligence.

The closest analogies to the facts of this case come from other circuits.[3] In Moore v. Knight, 368 F.3d 936, 938 (7th Cir. 2004), the jury asked the judge several factual questions, to which the judge responded without informing either side's counsel. Just prior to sentencing, the judge informed the defendant's lawyer about the communication but stated that she had told the jury that "she could not give information or could not answer those questions." Id. at 939. After the judge imposed a sentence, the defendant hired an investigator, who learned that the judge had actually commented upon the testimony. Id. The defendant then brought a habeas petition. Id. The state argued that the defendant was aware of the existence of the factual predicate for his claim prior to the end of his trial, when the judge told both side's attorneys that she had declined the jury's request to review the testimony. Id. at 938. The Seventh Circuit disagreed, holding that the defendant did not learn of the factual predicate for his claim until he had received the investigator's report. Id. at 939. In particular, the court noted that the judge's explanation of what transpired was not a basis for an actionable claim, especially because her description of her communications with the jury turned out to be different from what actually had occurred. Id. The court also held that the defendant was not "dilatory" in his investigation of the judge's ex parte communications, particularly given that "28 U.S.C. § 2244 does not require 'the maximum feasible diligence' but only 'due,

---

[3] The Fifth Circuit has considered 28 U.S.C. § 2244(d)(1)(D) in different contexts. See, e.g., Ybanez v. Johnson, 204 F.3d 645, 646 (5th Cir. 2000) (rejecting the petitioner's argument that the one-year clock began when the state court made errors in disposing of a state habeas application); Flanagan v. Johnson, 154 F.3d 196, 199 (5th Cir. 1998) (stating that the petitioner learned of the factual predicate for his claims for purposes of § 2244(d)(1)(D) when he executed his own affidavit stating that he did not know he could refuse to testify at trial).

or reasonable diligence.'" Id. at 940 (citing Wims v. United States, 225 F.3d 186, 190 n.4 (2d Cir. 2000)).

Similarly, in Wilson v. Beard, 426 F.3d 653, 662 (3d Cir. 2005), the court held that the defendant had not failed to act with due diligence to learn of the factual predicate for his claim when the defendant did not personally learn of the prosecutor's allegedly unlawful actions until his attorney notified him in prison. The fact that the news media broadcast a report on the prosecutor's unlawful tactics several days earlier was irrelevant. Id. The court held that "[t]he essential question is not whether the relevant information was known by a large number of people, but whether the petitioner should be expected to take actions which would lead him to the information." Id

Recently, the First Circuit noted that the "test of due diligence under section 2244(d)(1)(D) is objective, not subjective. . . . Thus, we are concerned less with what [the defendant's] counsel believed and more with what knowledge fairly may be imputed to him." Wood v. Spencer, 487 F.3d 1, 5 (1st Cir. 2007). The court held that the defendant's lawyer at trial "plainly was aware that some exchange had taken place between the decedent and a local law enforcement officer on the same evening that the fatal incident occurred" and that "[i]t was objectively unreasonable not to pursue that lead (indeed, the fact that the lawyer chose to inquire into the contents of the conversation when cross-examining a potentially hostile witness is a solid indication that he realized its potential relevance)." Id.[4]

---

[4] Courts from other jurisdictions also have touched upon whether a habeas petitioner acted with due diligence to learn of the factual predicate for a claim under § 2244(d)(1)(D), but the facts of those cases are not on point. See Daniels v. Uchtman, 421 F.3d 490, 492 (7th Cir. 2005) (holding that the petitioner's federal habeas action accrued when a witness executed an affidavit recanting the testimony he gave during a prisoner's murder prosecution, not on the date that the state supreme court rejected the prisoner's claim); Schlueter v. Varner, 384 F.3d 69, 74 (3d Cir. 2004) (stating that the petitioner could have learned of his counsel's potential conflict of interest with the exercise of due diligence given that his lawyer's affiliation with the assistant district attorney was widely known in the small legal community); Easterwood v.

Given these authorities, the state has not met its burden of demonstrating that the Magistrate Judge plainly erred in finding that Starns learned of the factual predicate for his claims as early as November 19, 2001, the date of the Gonzalez deposition, as opposed to during the trial. Much like the judge's actions in Moore, the state here severely downplayed the importance of Gonzalez's testimony, telling Starns that Gonzalez spoke to Feierabend only "two or three days" before her death, that Gonzalez said she had acted "strangely," and that her mental condition was irrelevant. This is a far cry from Gonzalez's actual testimony to the first grand jury, when he stated that he had spoken with Feierabend on the day of her death and that she sounded "insane" and "suicidal." While the state did offer to give Starns's counsel Gonzalez's contact information, it did so in a way that suggested that Starns would learn nothing useful from Gonzalez. Further, Starns learned that Gonzalez had testified before the first grand jury but not the second grand jury only from Gonzalez's deposition, as the state told Starns merely that Gonzalez had testified "before the grand jury." Thus, Starns did not fail to act with due diligence in not investigating further given the state's representations about the content, scope, and relevance of Gonzalez's testimony. Unlike in Wood, where the defendant knew that the victim had spoken with a law enforcement officer on the day of her death and had even cross-examined a hostile witness about the contents of that conversation, there is no indication here that Starns or his trial counsel had any

---

Champion, 213 F.3d 1321, 1323 (10th Cir. 2000) (stating that a prisoner does not fail to act with due diligence when he does not learn of a new case until it is accessible in the prison law library); Downes v. Carroll, 348 F. Supp. 2d 296, 301 (D. Del. 2004) (holding that the petitioner could have learned of the factual predicate for his claims before the date of the affidavits in question if he had exercised reasonable diligence given that he was able to obtain the affidavits without any problems while in prison); Small v. Miller, No. 03 Civ.240 DC, 2003 WL 22801332, at *2 (S.D.N.Y. Nov. 25, 2003) (holding that the limitations period under AEDPA began to run after the petitioner's investigator interviewed the person who found the victim and the petitioner's trial attorneys informed the petitioner that they had never received the police report regarding this person).

idea of the importance of Gonzalez's testimony, particularly given the state's position. As several circuits have held, a petitioner's diligence must merely be "due" or "reasonable" under the circumstances. See Wilson, 426 F.3d at 662. While Starns probably now regrets his lawyer's decision not to interview Gonzalez before the trial (and, indeed, presumably bases his claim for ineffective assistance of counsel on this fact), hindsight is 20/20; at the time Starns learned of Gonzalez's existence, there was no requirement that Starns act diligently to investigate further assuming the state could be taken at its word. In short, the Magistrate Judge did not plainly err in placing the date that Starns could have learned of the factual predicate for his claims at a point after his trial.

B.     The Magistrate Judge erred in imputing the civil attorney's knowledge of Gonzalez's testimony to Starns for his criminal habeas petition

The Magistrate Judge assumed, without any justification, that the date Davis, the civil lawyer, took Gonzalez's deposition was the date that Starns learned of the factual predicate for his habeas claims. This was error.

One's lawyer for one purpose is not necessarily that person's lawyer for all purposes. This court previously has distinguished between a party's criminal and civil lawyers. In United States v. Bi-Co Pavers, 741 F.2d 730, 736 (5th Cir. 1984), a criminal defendant asserted that the government failed to turn over a letter the government had received from the defendant's civil lawyer that contained material evidence. Id. This court held that the criminal lawyer should have investigated what the defendant's civil lawyer knew regarding the incident in question. Id. Thus, the defendant was not entitled to a new criminal trial based upon the newly discovered evidence because the defendant's criminal lawyer had not acted with due diligence to learn of this evidence from the civil lawyer. Id. Implicit in that decision, therefore, was a conclusion that what the defendant's civil lawyer knew was not automatically imputed to the criminal

representation. Instead, the court held that the criminal lawyer failed to act with due diligence by not obtaining the letter from the civil attorney. Id.; cf. United States v. Dyer, 722 F.2d 174, 177 (5th Cir. 1983) (distinguishing between the defendant's communications with his civil and criminal lawyers and holding that the attorney-client privilege applied only with respect to the communications with the criminal lawyer given the facts of the case). Similarly, a district court noted that although notice upon a counsel usually satisfies the requirement to give notice to a party, this rule is inapplicable when "a lawyer's representation may have ended or in which a client who retained a lawyer for one purpose may subsequently choose a different lawyer to handle the matter where, as in this case, the nature of the action has changed." Linder v. Trump's Castle Assocs., 155 B.R. 102, 105 (D.N.J. 1993) (stating that in the bankruptcy setting, notice to a personal injury attorney can be imputed to the attorney's client if the attorney is representing the client regarding a claim against the debtor).

The Magistrate Judge did not rely on any authority holding that the knowledge of a party's civil lawyer for a related claim is necessarily imputed to the party's criminal case. Here, the civil lawyer, Davis, did not represent Starns in any criminal capacity. Instead, he was a lawyer that Starns's parents' homeowner's insurance company had hired specifically for the wrongful death case, as the insurer would cover the civil damages stemming from that action. As they were completely separate cases, Davis's knowledge of the Gonzalez deposition for the civil case cannot be imputed to Starns for Starns's criminal proceedings.

The record does not reveal when Starns's criminal lawyer at the time, Rodney Baum, learned of the Gonzalez deposition. The letter from Davis to Starns's parents on December 18, 2001, merely stated that Davis had hand delivered the deposition transcript to Baum and that Baum had begun the

process of reading it. When Baum received the deposition transcript and began reading it is crucial, however, because that is the date that Starns learned of the factual predicate for his habeas claims. Absent a more definitive date for when Starns's criminal counsel learned of Gonzalez's testimony, at the latest Starns and his parents learned of the Gonzalez deposition on December 18, 2001, after receiving Davis's letter. Therefore, on remand, the district court must determine when Starns or his criminal lawyer learned of the Gonzalez deposition and must then calculate the one-year time limit in AEDPA using that date.[5]

## IV. CONCLUSION

The state has not demonstrated that Starns should have learned of the existence and relevance of Gonzalez's testimony with the exercise of due diligence at his trial. Further, the Magistrate Judge erred in her calculation of the one-year limitations period under AEDPA. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

[5] Practically speaking, if Starns or his criminal lawyer learned of the Gonzalez deposition on or before November 29, 2001, then his claims are still time-barred. Using November 29, 2001, as the date to begin the running of the one-year limit in AEDPA, there were 296 days between when Starns would have learned of the factual predicate for his claims and when he filed his state post-conviction petition, which tolls the running of the federal time limit. He exhausted his state claims on January 14, 2005, and he filed his federal application for a writ of habeas corpus seventy days later, on March 24, 2005 (using the "prison mailbox" rule, see supra note 1). This would mean that the total federal time limit had run 366 days. In contrast, if Starns or his criminal counsel learned of the Gonzalez deposition on November 30, 2001, or later—or if the court has no other evidence besides the Davis letter by which to determine when Starns learned of Gonzalez's testimony—then Starns's habeas application is timely.